Slip Op. 10-108

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                              :
SINCE HARDWARE (GUANGZHOU)    :
CO., LTD.,                    :
                              :
              Plaintiff,      :  Before: Richard K. Eaton, Judge
                              :
         v.                   :  Court No. 09-00123
                              :
                              :  Public Version
UNITED STATES,                :
                              :
              Defendant,      :
                              :
         and                  :
                              :
HOME PRODUCTS INTERNATIONAL,  :
LTD.,                         :
                              :
              Def.-Int.       :
_____:
```

OPINION AND ORDER

[Plaintiff's motion for judgment on the agency record sustained in part and remanded.]

Dated: September 27, 2010

*Dorsey & Whitney LLP* (*William E. Perry*) for plaintiff.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand* and *Carrie A. Dunsmore*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Thomas M. Beline*), of counsel, for defendant.

*Blank Rome LLP* (*Frederick L. Ikenson*, *Peggy A. Clarke*, and *Larry Hampel*) for defendant-intervenor.

Eaton, Judge:  Before the court is plaintiff's motion for
judgment on the agency record challenging the final results of
the administrative review of the antidumping order for Floor
Standing Metal-Top Ironing Tables and Certain Parts Thereof from
People's Republic of China ("PRC"), 74 Fed. Reg. 11,085 (Mar. 16,
2009) (final results) and accompanying Issues & Decision
Memorandum ("Issues & Dec. Mem.") (collectively, "Final Results")
for the period of review ("POR") August 1, 2006 through July 31,
2007.  *See* Pl.'s Mem. Supp. Mot. J. Agency R. ("Pl.'s Mem.").
This is the third administrative review of the order.

Using adverse facts available, the Department of Commerce
("Commerce" or the "Department") applied a PRC-wide rate of
157.68 percent to plaintiff's merchandise in the Final Results.
By its motion, plaintiff asks the court to instruct Commerce "to
treat Since Hardware as a company separate from [the] China-wide
entity and calculate a margin specific to Since Hardware using
the U.S. sales database and factors of production reported by
Since Hardware, as was done in the preliminary results of this
proceeding."  Pl.'s Mem. 12-13.  Defendant and defendant-
intervenor oppose plaintiff's motion.  *See* Def.'s Resp. Pl.'s
Mot. J. Agency R. ("Def.'s Resp."); Br. Home Products Int'l, Inc.
Opp. to Pl.'s Mot. J. Agency R. ("Def.-Int.'s Opp.").

The central question in this case is the lawfulness of
Commerce's conclusion that the inaccuracies in plaintiff's

questionnaire responses provided a sufficient basis for finding

that Since Hardware provided "'unreliable and incomplete'

documentation in support of its claimed purchase of market

economy materials" and that "the nature of the unreliable

submission called into question the reliability of questionnaire

responses submitted by Since Hardware in the review, including

its claim of eligibility for separate rate status."  Def.'s Resp.

15 (citing Issues & Dec. Mem. at Comm. 1).

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c)

and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).  For the reasons that

follow, plaintiff's motion is granted, in part, and the case is

remanded for further consideration.


<u>STANDARD OF REVIEW</u>

When reviewing the final results of an antidumping duty

review, the court "shall hold unlawful any determination,

finding, or conclusion found . . . to be unsupported by

substantial evidence on the record, or otherwise not in

accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(I).

<u>DISCUSSION</u>

I.   Legal Framework

    A.   Presumption of State Control and Commerce's Preliminary
        Findings

Plaintiff operates in the PRC.  As a result of the PRC's status as a non-market economy[1] country, its domestic companies are presumed to be part of the state-wide entity.  *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997) ("[I]t was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control . . . .  Moreover, because exporters have the best access to information pertinent to the 'state control' issue, Commerce is justified in placing on them the burden of showing a lack of state control." (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)).  The

---

[1]     A non-market economy includes "any foreign country that the administering authority [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A); *Shandong Huarong Gen. Group Corp. v. United States*, 28 CIT 1624, 1625 n.1 (2004) (not reported in the Federal Supplement).

"Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority."  19 U.S.C. § 1677(18)(C)(i).  The PRC has been determined to be an NME country.  The Department has treated the PRC as a non-market economy country in all past antidumping investigations.  *Zhejiang Native Produce & Animal By-Products Imp. and Exp. Corp. v. United States*, 27 CIT 1827, 1834 n.14, (not reported in the Federal Supplement) (citations omitted).

presumption, however, can be rebutted.  *See id*. at 1405 ("[T]he

Court of International Trade has ruled that an exporter in a

nonmarket economy country must 'affirmatively demonstrate' its

entitlement to a separate, company-specific margin by showing 'an

absence of central government control, both in law and in fact,

with respect to exports.'  Absence of de jure government control

can be demonstrated by reference to legislation and other

governmental measures that decentralize control.  Absence of de

facto government control can be established by evidence that each

exporter sets its prices independently of the government and of

other exporters, and that each exporter keeps the proceeds of its

sales.") (internal citations omitted).

    In this review, Since Hardware provided information relating

both to its separate rate status and the price of its

manufacturing inputs from claimed purchases from market economy

sources. *See* Def.'s Resp. 3-4 (citing questionnaire responses).

In the preliminary results, based on the company's questionnaire

responses, Commerce found that the company had demonstrated the

absence of de jure and de facto government control over its

activities, and thus was entitled to separate rate status.  *See*

Floor-Standing, Metal-Top Ironing Tables and Certain Parts

Thereof From the PRC, 73 Fed. Reg. 52,277, 52,279 (Dep't of

Commerce Sept. 9, 2008) (preliminary results) ("Preliminary

Results").  Also in the Preliminary Results, the Department

calculated an antidumping duty rate of 1.53 percent, based, in

part, on the prices from the claimed market economy purchases.

Preliminary Results, 73 Fed. Reg. at 52,280-82.


    B.   Factors of Production

    Because Commerce has found the PRC to be a non-market

economy, 19 U.S.C § 1677(18) requires the Department, when

calculating an antidumping duty margin,[2] to determine normal

value on the basis of the factors of production used in producing

the subject merchandise.  19 U.S.C. § 1677b(c)(1).  To value the

factors of production, Commerce generally uses prices or costs

from a market economy country that is at a level of economic

development comparable to that of the nonmarket economy country,

and which is a significant producer of comparable merchandise.

19 U.S.C. § 1677b(c)(4).  Accordingly, Commerce normally uses

information and data from a surrogate market economy country to

value the respondent's inputs used in the production of its

merchandise.

    Commerce does not use surrogate values, however, if a

---

[2]     In antidumping investigations, Commerce must ultimately
calculate or assign a dumping margin, *i.e.,* "the amount by which
the normal value exceeds the export price or constructed export
price of the subject merchandise." 19 U.S.C. § 1677(35)(A). If
the price of an item in the home market (normal value) is higher
than the price for the same item in the United States (export
price), then the dumping margin comparison produces a positive
number that indicates dumping has occurred.

respondent purchases inputs from a market economy country at the

market economy purchase price.  *See* Antidumping Methodologies:

Market Economy Inputs, Expected Non-Market Economy Wages, Duty

Drawback; and Request for Comments, 71 Fed. Reg. 61,716, 61,716-

19 (Dep't of Commerce Oct. 19, 2006) (notice) ("Market Economy

Inputs Methodology").  As to these purchases, Commerce has

instituted a

> rebuttable presumption that market economy
> input prices are the best available
> information for valuing an entire input when
> the total volume of the input purchased from
> all market economy sources during the period
> of investigation or review exceeds 33 percent
> of the total volume of the input purchased
> from all sources during the period.  In these
> cases, unless case-specific facts provide
> adequate grounds to rebut the Department's
> presumption, the Department will use the
> weighted-average market economy purchase
> price to value the entire input.

Market Economy Input Methodology, 71 Fed. Reg. at 61,717-18.  In

other words, Commerce's policy is to presume that market economy

purchase prices are the best available information, and thus,

where possible, to use them to value the total quantity of an

input.

    Here, in accordance with its policies, Commerce used the

reported market economy purchase prices to value plaintiff's

inputs of cold-rolled steel, hot-rolled steel, steel wire rod,

powder coating, cotton fabric, springs, bolts, center nail and

nail heads, rivets, cartons, corrugated paper, and labels.

Def.'s Resp. (citing Preliminary Results, 73 Fed. Reg. at

52,280).  Home Products International ("HPI"), the petitioner and

currently the defendant-intervenor, challenged Since Hardware's

market economy purchases, as it had in each of the prior segments

of this antidumping duty order.  *See* Def.'s Resp. 4-5; Mem. to

File Regarding July 15, 2008 and Aug. 7, 2008 Meetings with Fred

Ikenson, dated Aug. 12, 2008, Public Record ("PR") 47.

Petitioner met with Commerce to discuss its concerns, and

Commerce subsequently responded to this challenge by issuing five

supplemental questionnaires.

As a result of these questionnaires, it came to light that

the company had submitted false and fraudulent documentation

regarding the country of origin and valuation of the claimed

market economy purchases.  *See* Def.'s Resp. 5-14 (citing to

record).  Commerce stated:

> The certificates submitted by Since Hardware
> relating to its claimed purchases of a steel
> input from a market economy supplier are
> clearly not used by the regulatory agency
> responsible for certifying the origin of the
> input.  These certificates constitute the
> entire basis for establishing that Since
> Hardware purchased the steel input from a
> market economy supplier.  In its October 31,
> 2008 letter, the Department asked Since
> Hardware to explain the discrepancies
> detailed by Petitioner in the certificate of
> origin forms which Since Hardware submitted.
> However, Since Hardware failed to address the
> discrepancies . . . .

Issues & Dec. Mem. at Comm. 1.  The discrepancies, which have to

do with the country of origin of various inputs, are further

detailed in the Memorandum Regarding Since Hardware (Guangzhou)

Co., Ltd.'s Claim Re: Market Economy Purchases, and Use of

Adverse Facts Available, dated Mar. 9, 2009, Confidential Record

("CR") 870 ("AFA Memo").[3]  Further, Commerce found that the

---

[3]     The most serious issues related to Since Hardware's
claimed market purchases of [[                    ]] steel.
AFA Memo at 3.  Commerce noted:

> Since Hardware's claim of [[                    ]]
> steel purchases is inconsistent with World Trade Atlas
> [[              ]] export data for Harmonized Commodity
> Description and Coding System (HS) item [[          ]]
> ([[          ]] is the HS classification number for
> [[          ]] steel).  Since Hardware claimed it
> purchased [[        ]] metric tons of [[            ]]
> steel from [[            ]] during calendar 2007.
> However, Petitioner noted that World Trade Atlas (WTA)
> data for these same twelve months for HS [[            ]]
> indicate a total of only [[      ]] tons of [[
>         ]] steel were exported from [[            ]] to
> Hong Kong.  Further, Since Hardware claims all of its
> [[        ]] metric tons were purchased between the
> months of [[                    ]].  That claim is not
> consistent with WTA data, which indicate
> [[            ]] shipments of just [[      ]] metric tons
> to Hong Kong in April 2007, with no shipments at all
> during [[        ]] or [[        ]] 2007.  Further the data
> shows only [[      ]] metric tons in shipment of HS
> [[          ]] followed in [[              ]] . . . .
>
> More importantly, Petitioner noted that major
> discrepancies exist between the documentation submitted
> by Since Hardware and the certificate of origin form
> employed by the [[                ]] licensing board, the
> [[                                              ]]
> . . . .

AFA Memo at 3.  Moreover, the Department concluded, *inter alia*:

> The [[      ]] certificates submitted by Since Hardware
> are clearly not forms used by the [[        ]].  These

> identical typographical errors and other
> discrepancies appear on documentation
> submitted from multiple, independent,
> unaffiliated suppliers.  Since Hardware has
> never explained the source of these
> typographical errors and discrepancies, and
> has provided no credible explanation as to
> why the same set of typographical errors
> appear in the documentation submitted from
> multiple independent, unaffiliated suppliers.

Issues & Dec. Mem. at Comm. 1. In other words, Commerce found the

forms submitted by Since Hardware to substantiate its market

economy purchases were fraudulent.

    After the questionnaire responses revealed that the

company's documentation of these inputs appeared to be false,

Commerce asked for, among other things, mill certificates from

---

[[      ]] certificates constitute the entire basis for
establishing that Since Hardware's [[            ]]
steel was of [[            ]] origin.  In its October
31, 2008, letter, the Department asked Since Hardware
to explain the discrepancies detailed by Petitioners in
the [[    ]] forms which it submitted.  However,
Since Hardware failed to address the discrepancies
enumerated in Petitioners' September 2, 2008, letter
and summarized above.  These discrepancies include
numerous and inexplicable errors including the
misspelling of "[[                ]];" an easily
discernible discrepancy between the signature of the
[[    ]] official and that official's actual
signature; and unrecognizable [[      ]] signature/date
stamp; and an alpha-numeric numbering protocol
different from the sequential numbering employed by
[[      ]].  In addition, one of the certificates on
the record in the first administrative review was
purportedly signed by a specific [[      ]] official
long before she began her employment with the
[[      ]].

AFA Memo at 11.

the input manufacturers in order to determine the origin of the

inputs (e.g., the steel) used in the production of the subject

merchandise.  *See* Def.'s Resp. 12 (citing PR 73, CR 25).  Since

Hardware claimed it had no mill certificates to identify the type

of steel it bought or, for that matter, to verify any of the

other inputs it had purchased and used in its products.  Def.'s

Resp. 6 (citing PR 48, CR 14).  It further insisted that it

relied on its suppliers for country of origin information, and

indeed, relied on its suppliers for all the documentation it

submitted to Commerce.  Def.'s Resp. 12-13 (citing PR 61; CR 21).

The company then provided ledger entries that it claimed

documented its purchases.  Def.'s Resp. 10 (citing PR 57; CR 19).

The accounting ledgers included the disputed market economy

purchases.  AFA Memo at 11.  With respect to these ledger

entries, Commerce noted that they

> were purportedly associated with its market
> economy purchases . . . which were consistent
> with "the now-discredited . . . documentation
> submitted by Since Hardware."  Holding that
> "[t]his evinces that the pervasive errors in
> the . . . documents infect Since Hardware's
> own books and accounting records," and that
> Since Hardware's accounting records "reflect
> unreliable and inaccurate information"
> Commerce determined that it was unable to
> rely on the accuracy and validity of the data
> which Since Hardware retrieved from its
> accounting system.

Def.'s Resp. 16-17 (internal citation omitted).

When a respondent in an administrative review "significantly

impedes" the proceeding, Commerce is permitted to "fill [ ] gaps
in the record" using facts otherwise available.  *See* Statement of
Administrative Action, Uruguay Round Agreements Act, accompanying
H.R. Rep. No. 103-316, 656, 830-31 (1994), reprinted in 1994
U.S.C.C.A.N. 4040, 4199; *see also* 19 U.S.C. § 1677e(a)(2)(C).[4]
Based on the submission of false questionnaire responses,
"Commerce determined, pursuant to its statutory authority, to use
facts otherwise available because Since Hardware withheld
information requested by Commerce and significantly impeded the
investigation."  Def.'s Resp. 18 (citations omitted).

    Once it has determined that the use of facts otherwise
available is required, Commerce may make findings to determine if
the "use [of] an inference that is adverse to the interests of [a
respondent] in selecting from among the facts otherwise
available," is authorized.  Commerce may make an affirmative

---

[4]     If-

        (1) necessary information is not available on
        the record, or

        (2) an interested party or other person . . .

        (C) significantly impedes a proceeding under
        this subtitle, . . .

        the administering authority . . . shall,
        subject to section 1677m(d) of this title,
        use the facts otherwise available in reaching
        the applicable determination under this
        subtitle.

19 U.S.C. § 1677e(a)(C).

determination if it finds that the respondent "has failed to cooperate by not acting to the best of its ability to comply" with a request for information. *Nippon Steel Corp. v. United States*, 337 F. 3d 1373 (Fed. Cir. 2003) ("*Nippon Steel*"); 19 U.S.C. § 1677e(b).[5]

Because it found that, as a result of its unreliable questionnaire responses, plaintiff "failed to cooperate to the best of its ability," Commerce applied adverse facts available ("AFA"), and assigned an antidumping duty rate to the company that was equal to the highest rate calculated for a respondent in prior segments of the proceeding.  Def.'s Resp. 15 (citing Issues

---

[5]      Pursuant to 19 U.S.C. § 1677e(b):

If the administering authority ... finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority ..., the administering authority ..., in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from—

(1) the petition,

(2) a final determination in the investigation under this subtitle,

(3) any previous review under section 1675 of this title [periodic review] or determination under section 1675b of this title [countervailing duty injury investigations], or

4) any other information placed on the record.

& Dec. Mem. at Comm. 1).  Commerce explained: "Since Hardware's

conduct in this review . . . significantly impeded the

proceeding" by producing false information for market economy

purchases that "constitute a major portion of the production

inputs of the subject merchandise" to the effect that the

company's responses "are no longer reliable for purposes of

determining Since Hardware's margin of dumping."  AFA Memo at 10.

Commerce then found:

> We have determined that the documentation
> submitted by Since Hardware to support its
> claimed purchases of market economy inputs to
> be unreliable and inaccurate.  The
> deficiencies in Since Hardware's response
> establish a pattern of behavior that
> undermines the reliability and credibility of
> Since Hardware's entire questionnaire
> response, including Since Hardware's claim of
> eligibility for separate rate status.

Issues & Dec. Mem. at Comm. 1.  Commerce thus put aside the

entirety of Since Hardware's submissions, including evidence

relating to separate rate status, and assigned the PRC-wide

entity antidumping duty rate of 157.68 percent.  *See* Def.'s Resp.

15, 18.

    In its motion for judgment on the agency record, plaintiff

contends: (1) that Commerce should not have rescinded the

separate rate status plaintiff was afforded in the Preliminary

Results; and (2) that Commerce should have applied partial

adverse facts available only to valuing the inputs found to be

based on unreliable information, rather than total adverse facts

available.[6]  Pl.'s Mem. 11-13.  In pleading its case, plaintiff

does not contest the application of facts available, nor that

partial adverse inferences should be applied.  Pl.'s Mem. 11.


II.  Analysis

     A.   Separate Rate Status

     In the Final Results, Commerce concluded that the

"unreliable and inaccurate" information regarding market economy

purchases called into question all of Since Hardware's responses

including the record evidence regarding state control.  An

examination of the record, however, reveals that none of the

unreliable information submitted by the company is relevant to

the question of government control.  That is, while many of

plaintiff's answers to questions dealing with market economy

purchases were untrue, there is nothing to suggest that the

company was other than truthful when answering questions relating

to government control.  Put another way, the evidence that the

company was not controlled by the government (e.g., documentation

---

        [6]    The term "total adverse facts available" is not
referenced in either the statute or the agency's regulations. The
phrase can be understood within the context of this case to be
referring to Commerce's application of adverse facts available
not only to the facts pertaining to market economy purchases for
which false and fraudulent information was found to be provided,
but also to the facts respecting all of Since Hardware's sales
encompassed by the relevant antidumping duty order and evidence
relating to separate rate status.  *See Shandong Mach. Imp. & Exp.
Corp. v. United States*, 33 CIT ___, Slip Op. 09-64 at 14 n.5
(2009) (not reported in Federal Supplement) (citation omitted).

substantiating its claims that it is a wholly foreign-owned enterprise registered in PRC— such as the "Foreign Trade Law of the People's Republic of China" and copies of its business licenses— and evidence regarding de facto control over its export activities) is far removed from questions relating to the origin of the factors of production and their cost. *See, e.g.,* Preliminary Results, 73 Fed. Reg. at 52,278-9.

This Court has previously faced a similar situation relating to questionnaire responses. In *Qingdao Taifa Group Co. v. United States*, 33 CIT __, 637 F. Supp. 2d 1231 (2009)("*Qingdao*"), the Court found:

> Commerce may not apply the PRC-wide rate as the AFA rate where AFA is warranted for sales and [factors of production] data, but the respondent has established independence from government control.

33 CIT at __, 647 F. Supp. 2d at 1240-41 (citation omitted).

In *Qingdao*, as here, Commerce found an absence of government control in the preliminary results, and subsequently discovered the respondent's failure to report accurately factors of production data. The Court remanded the matter to Commerce to determine whether substantial evidence supported a finding of government control, and stated that if there was a sufficient link to the PRC, Commerce could apply the PRC-wide rate; if not, Commerce was directed to calculate a separate AFA rate for the respondent. *Qingdao*, 33 CIT at __, 637 F. Supp. 2d at 1240-41,

1244; *see Gerber Food (Yunnan) Co., Ltd. v. United States*, 29 CIT

753, 772, 387 F. Supp. 2d 1270, 1287 (2005)("Gerber") (finding

application of adverse facts available unsupported by substantial

evidence where Commerce imposed a rate that presumed government

control when respondent was found to be independent of government

control); *Shandong Huarong Gen. Group Corp. v. United States*, 27

CIT 1568, 1595-6 (2003)(not reported in Federal

Supplement)(same).

     Similarly, here, Commerce has found that Since Hardware's

responses failed to report accurately information, such as prices

and country of origin, for inputs purchased in market economy

countries.  The Department, however, made no specific finding

that the responses concerning state control were inaccurate.

When, as here, the use of AFA is justified, Commerce may "use an

inference that is adverse to the interests of [a respondent] in

selecting among the facts otherwise available." *Nippon Steel*,

337 F. 3d at 1381; 19 U.S.C. § 1677e(b).  When making this

selection, however, Commerce may not stray too far from the

questionnaire responses that justified the use of AFA.  Neither

Commerce nor defendant-intervenor has presented any information

tending to lead to the conclusion that Since Hardware's

questionnaire responses relating to government control were other

than truthful.  Consequently, remand is warranted.

B.    Adverse Facts Available Applied to Entirety of Since
      Hardware's Responses

As previously noted, by rejecting all of the company's
questionnaire responses, Commerce applied inferences adverse to
Since Hardware's interests in selecting from the facts available.
Def.'s Resp. 15 (citing Issues & Dec. Mem. at Comm. 1).  Since
Hardware contends that it

> is no[t] challenging either the Department's
> determination to apply facts available or the
> Department's determination to utilize an
> adverse inference as to Since Hardware in the
> application of facts available.  Since
> Hardware is challenging only the manner in
> which the Department applied adverse facts
> available to Since Hardware.

Pl.'s Mem. 11.  Specifically, the company contends that Commerce
overreached by finding that its production information was
unreliable not only as to the country of origin and cost of its
factors of production, but also as to the identification of each
factor and its quantity:

> The record in this case established that the
> Department may have been correct in
> determining that it was appropriate for the
> Department to rely upon facts available and
> to make adverse inferences with respect to
> Since Hardware's reported market economy
> purchases.  However, under the statutory
> scheme, the Department's application of
> adverse facts available should have been
> limited strictly to the offending
> information.  The Department's application of
> total adverse facts available, and its
> rejection of all of Since Hardware's
> responses, overreached the manner in which
> the statute authorizes the application of
> adverse facts available.

Pl.'s Mem. 20.  Therefore, while Since Hardware does not dispute
that the information it submitted as to the country of origin and
valuation of certain inputs was unreliable, it objects to
Commerce extending its finding of unreliability to all of
plaintiff's other factors of production responses.  Accordingly,
plaintiff argues, the court should "remand the action to the
Department with instructions for the Department to apply partial
adverse facts available and limit the impact of adverse facts
available only to the offending information relating to Since
Hardware's market economy purchases."  Pl.'s Mem. 20.  Plaintiff
further contends that Commerce, rather than being permitted to
assign a rate, should be instructed to use surrogate values to
value Since Hardware's other reported factors of production and
then calculate an individual rate for the company.

Commerce submits that its determinations are supported by
substantial evidence.

> Since Hardware submitted contradictory and
> unreliable information and these
> discrepancies permeated Since Hardware's
> responses.  By including the discredited and
> unsubstantiated market economy purchase
> prices in its accounting ledgers, Since
> Hardware rendered its entire submission
> inaccurate.  By failing to adequately explain
> the discrepancies in its supporting
> documentation to Commerce and provide
> requested alternative documentation, Since
> Hardware failed to cooperate with the
> administrative review.  Accordingly, Commerce
> applied total adverse facts available to
> Since Hardware.

Def.'s Resp. 21.  Further, Commerce found that the "problems with

the market economy input purchases pervaded Since Hardware's

entire responses."  Def.'s Resp. 16 (citing AFA Memo at 11).

Indeed, Commerce points out that after it questioned Since

Hardware's early submission, the company

> provided copies of ledger entries that were
> purportedly associated with its market
> economy purchases . . . , which were
> consistent with "the now-discredited . . .
> documentation submitted by Since Hardware."
> Holding that "[t]his evinces that the
> pervasive errors in the . . . documents
> infect Since Hardware's own books and
> accounting records," and that Since
> Hardware's accounting records "reflect
> unreliable and inaccurate information[,]"
> Commerce determined that it was unable to
> rely on the accuracy and validity of the data
> which Since Hardware retrieved from its
> accounting system.

Def.'s Resp. 16-17 (internal citations omitted).  Consequently,

Commerce insists that it cannot rely on Since Hardware's

submission in its entirety.

The court finds that Commerce's use of AFA to assign a

dumping rate to Since Hardware's merchandise is in accordance

with law and supported by substantial evidence.  First, it is

clear that the Department acted reasonably in determining that it

could not rely on the material the company placed on the record

relating to the country of origin and valuation of the factors of

production.  Plaintiff submitted forged and altered documents on

its market economy purchases.  Then it submitted accounting

ledgers that contained information taken from the forged and

altered documents.  As Commerce stated:

> Since Hardware submitted contradictory and
> unreliable information and these
> discrepancies permeated Since Hardware's
> responses.  By including the discredited and
> unsubstantiated market economy purchase
> prices in its accounting ledgers, Since
> Hardware rendered its entire submission
> inaccurate.  By failing to adequately explain
> the discrepancies in its supporting
> documentation to Commerce and provide
> requested alternative documentation, Since
> Hardware failed to cooperate with the
> administrative review.

Def.'s Resp. 21.

Here, Commerce's determination rests on credibility.  This

Court in *Shanghai Taoen Int'l Trading Co. v. United States*, 29

CIT 189, 360 F. Supp. 2d 1339 (2005) ("*Shanghai Taoen*"), upheld

the application of adverse facts available to an entire

submission in similar circumstances.  The Court noted that the

application of partial adverse facts available was not

appropriate because

> [t]his is not a case of partial gaps in the
> record.  Commerce determined that
> [respondent] failed to provide a credible
> explanation for the inconsistencies between
> Customs' entry documents and [respondent's]
> questionnaire responses which concerned the
> identity of suppliers.  Such information is
> core, not tangential, and there is little
> room for substitution of partial facts.

*Shanghai Taoen*, 29 CIT at 199 n.13, 360 F. Supp. 2d at 1348 n.13.

As in *Shanghai Taoen*, here the missing information on production

inputs goes to the core of the antidumping duty rate
determination, *i.e.*, the inputs at issue are a "major portion of
the production inputs of the subject merchandise."  AFA Memo at
10.  Since Hardware insists that its sales and factors of
production data were not tainted by its market economy input
purchases.  However, the unsubstantiated market economy purchase
prices were included in Since Hardware's accounting ledgers,
themselves found to "reflect unreliable and inaccurate
information."  AFA Memo at 11.  This being the case, it can
hardly be said that Commerce was unreasonable in determining not
to rely on these documents.  Thus, the court finds that, given
the pervasiveness of the inaccuracies in Since Hardware's
questionnaire responses, Commerce acted reasonably in determining
it could not rely on any of the company's financial information.
Accordingly, Commerce's application of adverse facts available to
all of plaintiff's input submissions is sustained.


                                CONCLUSION

     For the foregoing reasons, the court grants plaintiff's
motion, in part, and remands a portion of Commerce's
determination.  On remand Commerce shall reexamine the record to
again determine if Since Hardware has produced evidence
sufficient to qualify for application of a separate rate.  In
doing so, Commerce may not assume that the portion of the record

relating to independence from government control has been

impacted by Since Hardware's questionnaire responses to unrelated

matters.  If the record supports application of a separate rate,

Commerce must determine a separate AFA rate for Since Hardware;

if not, Commerce may apply the PRC-wide rate.  The remand results

shall be due on January 27, 2011; comments to the remand results

shall be due on February 28, 2011; and replies to such comments

shall be due on March 14, 2011.


                                    /s/ Richard K. Eaton
                                     Richard K. Eaton


Dated:     September 27, 2010
           New York, New York